PAYNE & RIGGIN *vs.* ST. LOUIS COUNTY.

The Court adhere to the decision made in Maupin *vs.* Parker, (3 Mo. Rep., 219, 2d edit.,) viz., that the acts of the General Assembly providing for the sale of the township school lands are not repugnant to the nature of the grant, and do not conflict with any provision of the constitution of Missouri.

The General Assembly having power to provide for the sale of these lands, for the use of schools, a purchaser under the law authorizing the sale of school lands acquires a valid title to the same.

ERROR to St. Louis Court of Common Pleas.

GEYER, *for Plaintiff in Error.*

1. The land was granted to the State, for the use of the inhabitants of the township, for the use of schools. (Act of Congress, 6th March, 1820, sec. 1, clause 1, and ordinance.) The State thus became a trustee, and could not relieve itself of the trust by any act of its own.

2. The trust is perpetual — the use to the inhabitants of the township — not at any particular period, but at all times, the future as well as the present.

3. There being in the contract by which the trust was created no express power for the purpose, the State cannot alter the nature of the trust property. (1 Saunders, 364; 2 Fonblanque, 167.) A trustee cannot, where land is the subject of the trust, convert that land into money.—Weller *vs.* Witter, 3 Williams, 99; Wilner *vs.* Harewood, 18 Ves., 274.

4. Although the legislature may provide for the disposition of property of which the State is absolute owner, it cannot impair, or change the obligation of a contract of the State, nor change the relation created, or duties assumed, by a contract entered into by the convention, of equal obligation with the constitution.

5. The legislature possesses no power over private property, so as to vary the right of succession to such property, where the trustee is an individual, and its power is not enlarged by the fact that the State is the trustee in virtue of a compact of paramount obligation.

6. It may be conceded, that under peculiar circumstances, and where it is *evidently* for the benefit of the trust estate, and of the parties in interest, a court of chancery may authorize a conversion of land into money, and money into land, but this power cannot be exercised by the legislature.

7. The convention not only bound the State by compact, in reference to the school lands, but by the 6th art., sec. 1, the whole power and duty of the general assembly over the trust property is defined. It is to take measures to *preserve it from waste or damage,* and apply the funds which may arise from such lands in strict conformity to the object of the grant.

In the case of Maupin *vs.* Parker, (3 Mo. Rep., 310,) this Court held that the legislature was competent to authorize the sale of the absolute estate in the school lands; but it is believed that the principles recognized in that case did not authorize the conclusion, and it is respectfully submitted that the opinion in that case ought to be re-considered.

In that case it agreed, that if a grant were made to A. to the use of B., A. could not alienate the land; and I apprehend that the State, as trustee, has no larger power over the estate of its *cestui que trust,* than A. would have in the case supposed.

The court says the State has the same jurisdiction over the land that she has over the real property of any individual within the limits.

This proposition is not controverted; she undoubtedly has the same legislative power over the property of her *cestui que trust* as she would have over that of the *cestui qui trust* of A., and no more.

Now, in case of a grant to A. to the use of B., A. cannot, by virtue of the contract to which he is a party, convey the absolute estate ; can the legislature enable him by law, enacted after the creation of the trust, to convey the estate? would it not impair the obligation of a contract?

It is true, as stated in the opinion, that the United States have divested themselves of their right of control over those lands, *with the express pledge of the State,* that the inhabitants of each township should be permitted to enjoy the same, for

the use of schools; but it does not follow that the legislature can alter the nature of the trust property, or discharge the State of the trust.

ALLEN, *for Defendant in Error.*

The defendant in error insists that the issues were correctly found. As to the first, there is no evidence disproving the execution of the bond sued on.

As to the second, there was no fraud shown as to the execution of the bond.— Alter et al. *vs.* Burrows and Jennings, 7 Mo. Rep., 424.

As to the third, fourth, fifth and sixth, the court is referred to the evidence, the following authorities, and the principle, "*Stare Decisis.*"—Constitution of Missouri, art. 6; act of Congress, 6th March, 1820; acts of Assembly, 6th December, 1820, 21st January, 1829, 11th February, 1833, 14th January, 1837. These refer to leasing:—Acts of Assembly, 17th January, 1831, 28th January, 1833, 19th March, 1835, 25th February, 1835, 25th January, 1839, 8th February, 1839, 9th February, 1839, 23d February, 1843. Session acts of 1842–3 are full of laws authorizing sale of school lands: 3d Mo. Rep., 310, Maupin *vs.* Parker — decided, Fayette District, April term, 1834; 1 Kent's Commentaries, 477; 2 Scamman's Rep., 57, 568.

The defendant in error also insists that the petition of the county of St. Louis is sufficient, and that the action of petition in debt is properly maintainable in this case.—Rev. Code of 1835, 449, 142; 2 Scamman's Rep., 314.

NAPTON, *Judge, delivered the opinion of the Court.*

This was an action of petition in debt, upon a bond given by the plaintiffs in error to the county of St. Louis, for the use of the inhabitants of township 47, range 5 East. The defendants pleaded, first, the general issue; second, that the bond was obtained by fraud; third, that the bond was executed without any consideration; fourth, that the bond was executed in consideration of a sale made by the sheriff of St. Louis county, to the defendant, Payne, of land in said county, at public auction, by virtue of an order of the County Court, and that said county had not, at the time of making said order, or since, any right, title, interest, or estate, in said land, nor had said Court any authority, or lawful jurisdiction to order said sale; wherefore said bond is void, &c. Fifth plea is the same. The sixth plea avers, that said bond was obtained in consideration of the sale of lands, made by the sheriff of St. Louis county to the defendant, Payne, and for no other cause or consideration whatever; which said land, at the time of said sale, was, and is, the property of the State of Missouri, for the use of the inhabitants of township No. 47, range 5 East, for the use of schools, and the said sale was made by said sheriff, without any lawful authority whatever; Wherefore, &c.

To these pleas, suitable replications were filed, and the matters in issue were submitted to the court, upon a case agreed, which is, in substance, as follows:—

At the May term, 1838, of the St. Louis County Court, the said court made an order, upon the petition of sundry white householders of Congressional township

44 north, range 5 East, praying for the sale of school lands in said township, and, upon being satisfied that a majority of the householders residing within said township had signed said petition, directed the sheriff to expose to sale said lands, after giving sixty days' notice, by advertisement, duly and legally put up, in the manner and upon the terms directed by law. Pursuant to said order, the sheriff did advertise, according to law; the lands were sold at the time and place specified in the advertisement, and Thomas J. Payne, one of said defendants, became the purchaser of sundry parcels of said section, for which the sheriff gave him a certificate of purchase. At the same time, said Payne executed his bond to the county of St. Louis for the purchase money, which is the same set out in the petition. If, upon said case, the court should be of opinion that the plaintiff should recover, the issue to be found accordingly; but if, on the contrary, that the plaintiff should not recover, then, that a judgment of non-suit be entered.

The court, being of opinion that the plaintiff was entitled to recover, found the issue accordingly, and to reverse this judgment, this writ of error is brought.

The question presented by the record is the same which this Court decided in the case of Maupin *vs.* Parker, 3 Mo. Rep. The first act of the legislature, authorizing the sale of the sixteenth section, was passed January 17th, 1831. The decision of the court, sustaining the validity of the law, was made in 1834, since which several other acts have passed, substantially like the act of 1831, though modified in details.

In the celebrated case of McMulloch *vs.* The State of Maryland, (4 Whea. Rep., 316,) Chief Justice Marshall declared, that an exposition of the constitution deliberately established by *legislative* acts, on the faith of which an immense property has been advanced, ought not to be lightly disregarded. If this be true in relation to the exercise of the delicate power incident to courts, of reviewing the acts of a co-ordinate branch of the government, how much more forcible does the remark apply to a case where *all* the departments, legislative, executive, and judicial, have deliberately given sanction to the law. Thirteen years have elapsed since the passage of the first act on this subject; that act was pronounced constitutional, and successive enactments, recognizing the same principle, indicate an acquiescence on the part of the legislature and the people. Property, to a large amount, has been invested on the faith of these acts. Under this state of legislative action and judicial decision, the maxim of "*stare decisis*" is believed to be peculiarly applicable, and upon this ground this Court considers the question settled.

Apart from this view of the case, in which all the Court concur, I will briefly add my reasons for holding the law constitutional.

By the act of Congress, March 6th, 1820, the following, among other propositions, was made:—"First, that section No. 16 in every township, and when such section has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to the State for the use of the inhabitants of such township, for the use of schools."

This grant was to be in consideration that the land sold by the United States should remain exempt from taxation for five years after the day of sale, and the

military bounty lands should be exempted from taxes for three years.—Rev. Code, 1825, p. 38.

The convention, by ordinance, accepted this proposition on the 13th July, 1820; and accordingly provided in the constitution, in art. 6, sec. 1., "that schools and the means of education shall forever be encouraged in this State; and the General Assembly shall take measures to preserve from waste or damage such lands as have been, or may hereafter be, granted by the United States for the use of schools within each township in this State, and shall apply the funds which arise from such lands in strict conformity to the object of the grant: one school or more in each township shall be established as soon as practicable and necessary, where the poor shall be taught gratis."

To carry into effect this provision of the constitution, the legislature passed an act on the 6th Dec., 1820, providing for the leasing of the school lands, and applying the proceeds to the purposes designated in the constitution. This policy prevailed until 1829, when the leasing of unimproved sections was prohibited; (act of Jan. 1, 1829;) and in 1831, the plan of selling the sixteenth section was adopted, which prevails to the present day.

This is a grant from the United States to the State of Missouri, for certain purposes, and on certain considerations specified in the grant. To construe a grant from one sovereign to another by those technical rules which govern the construction of contracts between individuals, is not reasonable nor in accordance with the doctrines recognized in judicial tribunals, when subjects of this character are investigated. The intent and spirit of the act; the purposes it was designed to promote, and the relative situation of the high contracting parties, should be examined and ascertained, and a strict legal interpretation must be rejected if it manifestly tends to subvert the ends proposed to be accomplished. It was observed by a distinguished judge, (C. J. Tighlman, in Farmers' and M. Bank *vs.* Smith, 6 Hall, L. I. 547,) that "Conventions to regulate the conduct of nations are not to be construed as articles of agreement at common law." "It is of little importance to the public," he adds, "whether a tract of land belongs to A. or B. In deciding their titles, strict rules of construction may be adhered to, though sometimes at the expense of justice, because certainty of title is thereby produced, and individual inconvenience is richly compensated by general good; but when multitudes are affected by the construction of an instrument, great regard should be paid to the *spirit and intention.*"

If we apply the common law rules of construction to this grant of the school lands, we are involved in difficulties which we can only surmount by a complete subversion of every beneficial purpose for which the grant was made.

In the first place, it is conceded, that by this rule of construction the lands are inalienable. This of itself is not only contrary to the general policy of our government, which is decidedly hostile to the creation of perpetuities, and having lands locked up in mortmain, but tends directly to frustrate the obvious intent of the parties.

The object of both parties was, the advancement of education and the provision of a fund for that purpose. If the lands be inalienable, how is that purpose to be

attained? It cannot be supposed that Congress or that convention were ignorant of the condition of the country for whose benefit they were legislating. It is folly to suppose that wild lands can be leased advantageously, when those of the best quality can be purchased for one dollar and a quarter per acre; nor is it likely that this state of things will be altered for the next half century. Did Congress design that the benefits of this grant should accrue solely to our successors, and be unavailing to the existing generation? Are we to wait for a school fund until *leasing* becomes profitable — until our population is as dense as that of Holland or Great Britain?

The *cestuys que use*, if they embraced only the present inhabitants, being the same people which constitutes the State, (who, as trustee,) might claim the land; but as it is clear that the future as well as the present inhabitants of the township are beneficially interested in this grant, the consent of the *cestuys que trust* to any disposition made by the trustee could never be obtained, and the land is inalienable.

Again: This grant cannot be construed as a common law gift to a charity. If it be so, the State of Missouri, being both *founder* and *visitor* of the fund, would have an entire control over it. But the very essence of a charitable donation is the want of consideration, which is not so in this grant. It is founded on a valuable consideration, viz., the exemption of the United States' lands from taxation.

In the third place, if this grant is to be regarded as creating a trust, and to be construed by the rules applicable to such estates, the objections are not diminished. An ordinary trustee may, under certain circumstances, and under the direction of certain courts having cognizance of these subjects, change the nature of the trust estate by converting land into money or money into land; but what court could undertake to advise this trustee, the State, or its organ, the legislature, as to the suitable disposition or management of its trust estate.

Lastly, This grant, if construed by the strict rules of common law, would be void for uncertainty in the description of the *cestuys que use*. The inhabitants of a township are not a corporate body.— Co. Litt.

These considerations are sufficient to show, that a construction of the terms of this grant, by the strict rules of the common law applicable to individual transactions, would frustrate the laudable and benificent purposes of both the contracting parties. I therefore conclude, that some other construction must be adopted, more consistent with the intent of the parties, and more consonant with the general powers and rights of the State. It is beyond controversy, that the United States have no interest whatever in these lands; that they parted with all their title; and whether the State has, or has not, executed the trust, cannot be a subject of enquiry in her courts. It is true, that in the grant to Ohio, of the 16th section, by the act of 1802, (which was to the inhabitants of the township,) Congress, at the request of the legislature of that State, passed the act of 1803, vesting these lands *in the legislature* of the State, in trust for the support of schools, and afterwards, to quiet purchasers, passed the act of February 1st, 1826, authorizing Ohio to sell her school lands. A reference, however, to the discussion which preceded the pass-

age of that act, (Gales & Seaton's Register, vol. 11, p. 667, 842), will show, that neither house entertained any doubts as to the power of the Ohio legislature. It cannot be pretended, in relation to the .grant to this State, that Congress has any power to compel the State to execute the trust. The legislature is restricted only by the constitution of the State. This prevents and prohibits a diversion of the fund from the purpose to which it has been dedicated. The legislature is required to apply the funds "arising from these lands," in strict conformity to the object of the grant. Whether these funds are to arise from leasing, renting, or selling, is not specified in the constitution. There is no restriction on the subject. Will it be contended, that the injunction upon the legislature to take measures to preserve the lands from waste. and damage, or to improve them, implies a prohibition from selling? Such is not the construction placed upon similar measures, when taken by a private land proprietor. In the second section of the same article which regulates the duties of the legislature, in relation to the 16th section, it is provided, for the management of the seminary lands, that the monies arising from the lands, "whether by rent or lease, or *in any other manner*," shall constitute a fund for the establishment of a university. The terms are broad enough to comprehend a disposition of the lands by sale, as well as the specific modes enumerated in the section.

I am therefore of opinion, that the act of the legislature, authorizing the sale of the 16th section, is constitutional, and, consequently, that the plaintiff, in the case agreed, was entitled to recover.

Judgment affirmed.